UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUEWA ABEANA LEE,<br><br>   Petitioner,<br><br>   v.<br><br>MOLLY HILL, Warden,<br><br>   Respondent. | No. 2:18-cv-2730 MCE AC<br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a California state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The action proceeds on the original petition, ECF No. 1, which challenges petitioner's 2013 conviction for child abuse and related offenses. Respondent has answered. ECF No. 11. Petitioner did not file a traverse.

BACKGROUND

I. Proceedings in the Trial Court

A. Preliminary Proceedings

Petitioner was charged in Sacramento County with the physical abuse of her incarcerated boyfriend's 12-year-old daughter over a period of two months. The case went to trial.

////

////

////

B. <u>The Evidence Presented at Trial</u>

    1. <u>The Prosecution Case</u>

The jury heard evidence of the following facts.[1] In July 2011, petitioner lived with her boyfriend, Wade; his 12-year-old daughter, C; and her own six children including a 13-year-old daughter, P.; a 12-year-old daughter, A.; and a three-year-old son, T. At the end of July, Wade was arrested and ultimately sent to prison for committing a robbery. C. remained at the house with petitioner. P. moved in with her aunt in Los Angeles around the first week of August.

While Wade lived at the house, C. had her own bedroom and petitioner's six children shared two bedrooms. After he was arrested, petitioner moved C. into one of the shared bedrooms, where she would often be required to sleep on the floor. C.'s chores around the house also changed. Prior to Wade's arrest, the children shared in the chores. Afterwards, defendant required C. to do them all.

According to C.'s testimony, after morning chores petitioner would make her stand in the corner of petitioner's bedroom while balancing on one leg with her arms raised above her head. Sometimes she would have to stand in the corner for the entire day. When petitioner believed C. had done something wrong, she would make the child hold her hands out with the palms up and then strike them with a metal spatula, which sometimes caused her hands to bleed. On one occasion, petitioner heated that spatula on the stove and placed the object against her buttocks, causing burns. Petitioner also burned C.'s buttocks and back with a pan she also heated on the stove. She did this because C. had not washed the dishes to petitioner's satisfaction. On another occasion, while C. was standing in the corner of petitioner's room, petitioner burned her with the tip of a clothes iron because she believed C. had lied about something.

On many occasions, petitioner struck C.'s legs and back with an extension cord. On many other occasions, petitioner pushed C. to the ground and kicked her in the chest and abdomen, sometimes causing her to black out. On one occasion, petitioner pushed C. down the stairs in the house, told her to come back up, and then pushed her down the stairs a second time, causing her

---

[1] This factual summary is adapted from the opinion of the California Court of Appeal, Lodged Doc. 14 (ECF No. 12-14) at 3-8. The undersigned finds that the summary is accurate.

head to strike the wall. On another occasion, petitioner pushed C. into the window in the bedroom she shared with two of petitioner's daughters, causing the window to break. She then blamed C. for the broken window and made her sleep on the floor without a blanket. On yet another occasion, petitioner twice stapled C.'s ear. When the first staple did not go all the way through, she had A. hold C. down while she stapled the ear again.

C. further testified that whether she was allowed to eat or not depended on petitioner's mood: "If she was like happy, then she would let me. But if she was like mad or she wasn't like in the mood for something, then she wouldn't." Petitioner told C. it was her father who did not want her to eat. When C. finally reported the abuse to a stranger at the DMV at the end of September, she had not eaten for three days.

On the morning of September 30, 2011, about two months after the abuse began, petitioner took C. and the three youngest children with her to the DMV while the other children were in school. They sat next to Carol Berkley and her 16-year-old daughter. At some point, petitioner went outside with her two young sons, which provided an opportunity for C. to ask Berkley for help. As Berkley explained, while C. appeared to be "very frightened, very timid, very unsure," she quietly and clearly conveyed she was being abused and needed help. In response to questioning from Berkley, C. revealed some of the details, including "that she had been pushed down stairs" and "that she had [been] pulled from school because [petitioner] was afraid that she would be found out." Petitioner returned with the boys a short time later, at which point Berkley pretended nothing had happened, waited for her number to be called, and then revealed what C. had told her to the DMV employee behind the counter. That employee informed her supervisor of the situation, and the supervisor called law enforcement.

Officers arrived a short time later. One of the responding officers spoke to C. in a break room at the DMV. C. told the officer that petitioner was abusing her. The officer also noticed an open wound on the child's left ear. She informed him petitioner had stapled her ear. Another officer transported C. to Sutter Memorial Hospital for a medical examination. C. also told this officer she was being abused by petitioner and explained the abuse began after her father was arrested and continued for the next two months. She recounted most of the abuse to which she

3

would later testify at trial, including being pushed down the stairs, being pushed to the ground and kicked in the stomach multiple times, being hit with a frying pan, being burned with a heated spatula and clothes iron, and being struck on the legs with an extension cord.  C. also revealed petitioner's practice of making her stand in the corner on one leg with her arms over her head and that she was required to sleep on the floor without a blanket.

C.'s medical examination corroborated her allegations of abuse.  As the doctor who examined her testified, it "appeared that her entire body was covered with injuries."  C. had multiple bruises on her neck, collarbone, and right ear that were no more than a week old.  Her left ear had built up scar tissue, commonly referred to as "cauliflower ear," an injury caused by repeated blows to the ear and often seen on boxers or wrestlers.  C. had injuries inside of her mouth, including a deep laceration of the tongue, consistent with being hit in the face no more than a few days before.

C. had more than two dozen loop-shaped marks on her legs, back, shoulders, and chest, some bruises and some scars.  Each was consistent with having been hit with a cord.  The bruises were no more than a week old.  The scars were older than that and were likely caused by the skin tearing while being hit and subsequently forming scar tissue.  In addition to these loop-shaped marks, C. also had bruising to her chest and abdomen that was consistent with having been "stomped" by a shoe, including some with a "stripe pattern" resembling "hash marks."  Again, this bruising was no more than a week old.  Her claims of being burned with a spatula were also corroborated by "extensive burns on the buttocks" that were caused by an object that had a "very square sort of edge to it."  These burns were in the process of healing that indicated they were likely inflicted within the previous month.

When the doctor examined C.'s abdomen, the child was in obvious pain.  An emergency CT scan revealed internal injuries to her liver, pancreas, and small intestine. While these injuries did not require surgical intervention, the doctor considered them "very severe" and "potentially life threatening," explaining: "She could have died if she had another injury to the abdomen or even just with normal activity, if she had continued injury to the liver, she could have died."  The doctor also estimated these internal injuries were inflicted within a few days of the examination.

DNA extracted from apparent blood stains on a metal spatula and clothes iron seized from the house matched C.'s DNA. There was also a dent in one of the walls of the stairwell, blood on the wall and carpet below the dent, and one of the windows in an upstairs bedroom was broken.

Petitioner's daughter P. and son T. were both interviewed during the investigation and reported that petitioner had abused and injured C. These reports were consistent with C.'s physical injuries. Both P. and T. testified at trial that petitioner had not abused C., and their prior inconsistent statements were admitted. At trial P. testified that both Wade and P. herself had abused C. In her earlier statement, P. had reported that petitioner asked her to take the blame for C.'s injuries.

Both P. and A. had previously accused petitioner of abusing them. The evidence regarding these prior allegations of child abuse are described more fully below, in relation to petitioner's claim for relief.

### 2. The Defense Case

Petitioner testified in her own defense. She denied C.'s allegations of abuse. She testified that Wade was the one who disciplined the children and that he would hit C. with an extension cord. She further testified that P. and C. would routinely punch each other, both before and after Wade's arrest.

A. also testified on her mother's behalf. She testified that she saw Wade punch C., throw her down the stairs, and hit her with his hand, a belt, and an extension cord. She denied seeing her mother hit, kick, or burn C., denied helping defendant staple C.'s ear, and claimed the injury to the ear was a bug bite. According to A., C. made up the allegations of abuse because she was upset about being homeschooled.

### C. Outcome

The jury found petitioner guilty of torture, mayhem, and child abuse. She was sentenced to life with the possibility of parole.

## II. Post-Conviction Proceedings

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of conviction on April 24, 2017. Lodged Doc. 14 (ECF No. 12-14). The California Supreme Court

denied review on July 12, 2017.  Lodged Doc. 16 (ECF No. 12-16).  Petitioner filed no applications for collateral relief in the state courts.

STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons.  Harrington v. Richter, 562 U.S. 86, 99 (2011).  State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary.  Id. (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).  Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529

6

U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407-08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Review under § 2254(d) is limited to the record that was before the state court. Cullen v. Pinholster, 563 U.S. 170, 180-181 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. Id. at 181-182. In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 182. Where the state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc). A different rule applies where the state court rejects claims summarily, without a reasoned opinion. In Richter, supra, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny. Richter, 562 U.S. at 102.

## DISCUSSION

I. Petitioner's Allegations and Pertinent State Court Record

Petitioner presents a single claim for relief: that her right to due process was violated by CALCRIM No. 852, which permitted the jury to infer propensity and guilt from evidence of prior acts of child abuse. ECF No. 1 at 4.

The record reflects the following. At trial, a police officer was permitted to testify that he spoke to P. in April 2010 in response to a call of possible child abuse. P. told the officer that she and petitioner got into an argument, during which petitioner "grabbed her by the collar and pushed her against the wall," choking her when she did so, and then "threw her down on the ground" and "stomped on her chest, stomach and left ankle." P. claimed such abuse had been going on for about two years. The officer also spoke to A., who reported that petitioner hit the children with a belt and slapped them in the mouth.

The trial court also admitted evidence that during P.'s conversation with the social worker who returned her to Sacramento in October 2011, P. claimed that she had repeatedly run away to escape petitioner's abuse and that petitioner "whooped" all the children. During P.'s subsequent interview with the detective, she also claimed petitioner abused her, adding she was hit with a hanger, a high-chair tray, and a spatula. She further described an occasion in which petitioner hit A. and caused her head to strike a car window.

The jury was instructed as follows, pursuant to CALCRIM No. 852:

> The People have presented evidence that the defendant committed child abuse that was not charged in this case.
>
> Abuse means intentionally or recklessly causing or attempting to cause bodily injury or placing another person in reasonable fear of imminent serious bodily injury to herself or someone else.
>
> You may consider this evidence only if the People have proved by a preponderance of the evidence the defendant, in fact, committed the uncharged child abuse. Proof by a preponderance of evidence is a different burden from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.
>
> If the People have not met this burden, you must disregard this evidence entirely.
>
> If you decide the defendant committed the uncharged child abuse, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit child abuse, and based on that decision, also conclude the defendant was likely to commit the offenses charged involving child abuse as charged here. If you conclude the defendant committed the uncharged violence, that conclusion is only one factor to consider along with all of the other evidence. It is not sufficient by itself to prove that defendant is guilty of the charged offenses. The People must still prove each charge and allegation beyond a reasonable doubt.
>
> You may also consider this evidence for the limited purpose of evaluating the credibility of [P.] and [A.]

1 CT 188-189; 5 RT 1407-1408.

II. The Clearly Established Federal Law

Claims of error in state jury instructions are generally matters of state law, and thus may not be considered on federal habeas review. See Gilmore v. Taylor, 508 U.S. 333, 343-44 (1993). Federal habeas relief is available only where instructional error violated due process by rendering

8

the trial fundamentally unfair. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). Alleged instructional error "must be considered in the context of the instructions as a whole and the trial record." Id. at 72.

The admissibility of evidence is also governed by state law, and the jury's consideration of evidence for a specific purpose violates due process only when it renders a trial fundamentally unfair. Id. at 70, 72. The Supreme Court has rejected the theory that due process necessarily requires the exclusion of prejudicial or unreliable evidence. See Spencer v. Texas, 385 U.S. 554, 563-564 (1967); Perry v. New Hampshire, 565 U.S. 228, 245 (2012).

### III.   The State Court's Ruling

This claim was raised on direct appeal. Because the California Supreme Court denied discretionary review, the opinion of the California Court of Appeal constitutes the last reasoned decision on the merits and is the subject of habeas review in this court. See Ylst v. Nunnemaker, 501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

The state court ruled as follows:

> Defendant further asserts the trial court prejudicially erred and violated her right to due process by instructing the jury with CALCRIM No. 852. Defendant did not object to this instruction at trial. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818, 299 P.2d 243. [Citation.]" (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.) We conclude there was no error, much less a miscarriage of justice. The claim is therefore forfeited.
>
> […]
>
> We have previously rejected a due process challenge to this instruction. (*People v. Johnson* (2008) 164 Cal.App.4th 731, 739-740.) For the same reasons expressed therein, we also reject defendant's assertion the instruction lightened the prosecution's burden of proof in this case. We also reject her argument CALCRIM No. 852 is argumentative under the standard of *People v. Wright* (1988) 45 Cal.3d 1126. Indeed, in *People v. Kelly* (1992) 1 Cal.4th 495, our Supreme Court rejected the same argument with respect to an analogous consciousness-of-guilt instruction because that instruction, like CALCRIM No. 852, did "not merely pinpoint evidence the jury may consider," but also informed the jury the evidence "is not sufficient by itself to prove guilt." (*Kelly* at p. 531, italics added.) Similarly, here, CALCRIM No. 852 highlighted the uncharged child abuse evidence in order to inform the jurors it was

> not sufficient to prove defendant's guilt, but also informed the jury such evidence could be considered in conjunction with all of th other evidence. As our Supreme Court explained in *Kelly*: "If the [trial] court tells the jury that certain evidence is not alone sufficient to convict, it must necessarily inform the jury, either expressly or impliedly, that it may at least consider the evidence. Nothing in Wright affects such an instruction. There was no error." (*Id.* at pp. 531-532.)
>
> Defendant's assertion of instructional error is therefore forfeited.

Lodged Doc. 14 (ECF No. 12-14) at 15-16.

### IV.   Procedural Default

Respondent contends that petitioner's claim is procedurally defaulted. See ECF No. 11 at 10. As a general rule, a federal habeas court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment—including imposition of a state law procedural bar. See Coleman v. Thompson, 501 U.S. 722, 729 (1991).  However, a federal habeas court may bypass a procedural default to reach the merits of a non-meritorious claim. See Lambrix v. Singletary, 520 U.S. 518, 525 (1997); Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002).  The court elects to do so with respect to this claim.

### V.   Objective Reasonableness Under § 2254(d)

The California Court of Appeal acknowledged petitioner's federal due process argument and rejected it for the reasons stated in People v. Johnson, 164 Cal.App.4th 731 (2008).  In Johnson, the court had affirmed the constitutionality of CALCRIM No. 852 in light of the California Supreme Court's approval of a virtually identical instruction that applies to sex offenses. Johnson, 164 Cal. App.4th at 739-740 (citing People v. Reliford, 29 Cal.4th 1007 (2003)).  The court of appeal's summary rejection of petitioner's claim involves no objectively unreasonable application of clearly established federal law.

The clearly established federal law is that articulated in Estelle, which itself was a child abuse case in which the Supreme Court rejected a claim that admission of evidence of prior injury to the child victim violated due process.  Because the evidence was relevant, the Court rejected out of hand the theory—which had been accepted by the Court of Appeals—that its consideration

by the jury could have violated due process. Estelle, 502 U.S. at 70.

Under AEDPA standards, a challenge to propensity evidence cannot success because there is no "clearly established federal law" requiring its exclusion. The Supreme Court has never found that the admission of prior bad acts evidence, or propensity evidence of any kind, violates due process. Where the Supreme Court has not expressly announced the specific constitutional rule on which a petitioner relies for relief, there can be no unreasonable application of clearly established federal law. Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) (per curiam). For this reason, the Ninth Circuit has repeatedly rejected § 2254 claims based on the admission of prejudicial evidence including character and propensity evidence. See Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); Alberni v. McDaniel, 458 F.3d 860, 866 (9th Cir. 2006), cert. denied, 549 U.S. 1287 (2007). The same result is compelled here. If admission of the evidence does not violate "clearly established" due process rules, then neither does a jury instruction permitting and limiting its consideration.

The instruction that was given in petitioner's case carefully limited the purposes for which the other bad acts evidence could be considered. It reminded the jury that conviction required proof beyond a reasonable doubt of all elements of each charged offense, and that evidence of the previous abuse of other children was not enough to meet that standard. On this record, especially when the instructions as a whole are considered in light of the evidence as a whole, it is impossible to conclude that petitioner's trial was rendered fundamentally unfair.

## CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections,

he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  See 28 U.S.C. § 2253(c)(2).  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: August 7, 2023

/s/ Allison Claire
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE